[Civ. No. 22419. Second Dist., Div. Two. Mar. 27, 1958.]

CALIFORNIA BEVERAGE AND SUPPLY COMPANY (a Corporation), Plaintiff and Appellant, v. DISTILLERS DISTRIBUTING CORPORATION (a Corporation), Defendant and Appellant.

J. Albert Hutchinson for Plaintiff and Appellant.

Lawler, Felix & Hall and John M. Hall for Defendant and Appellant.

FOX, P. J.—This litigation grows out of a contractual relationship between plaintiff and defendant concerning the distribution of Calvert distilled spirits. Plaintiff was awarded damages for two asserted breaches of the contract. As to these issues defendant has appealed. Plaintiff also sought damages for other alleged breaches of contract and for certain tortious conduct, including unfair competition, conspiracy and restraint of trade. The trial court directed a verdict in defendant's favor upon all these issues. Plaintiff has appealed from this portion of the judgment.

This case is the companion of *A.B.C. Distributing Co.* v. *Distillers Distributing Corp.*, 154 Cal.App.2d 175 [316 P.2d 71], recently decided by this court. The issues in the two cases are substantially the same,[1] and that decision is controlling on many of the issues raised herein,

---

[1] Plaintiff's initial brief in this case, filed prior to the A.B.C. opinion, stated that "plaintiff's appeal herein presents the same issues as are now pending before the Court in the [A.B.C. case], in which the defendants are identical, the plaintiffs are similarly situated and counsel are common to both cases." The brief states further: "Since no material differences in the issues, proof and disposition of the withheld issues exist as between the two cases, plaintiff deems it inappropriate to repeat at length the outline of the facts, applicable statutes and rules of decision set forth in the briefs on file in the A.B.C. case and takes the liberty of referring the Court to the presentation in the latter as equally

Plaintiff is a wholesale distributor of alcoholic beverages. It purchases from manufacturers and other distributors and resells to retail dealers. Defendant is, by virtue of successive mergers, the successor to Calvert Distillers Corporation. It manufactures Calvert products and sells them to distributors. Prior to June, 1951, plaintiff had been a distributor of Calvert products in Los Angeles and Orange counties pursuant to a verbal agreement with Calvert. There were also several other Calvert distributors active in those areas over the years, but by 1951 only three were active: plaintiff, Simon Levi, and A.B.C. During the period prior to June, 1951, each of the three distributors had been at liberty to sell Calvert products in competition with the others to any retail liquor licensee anywhere within those areas. After June, 1951, Calvert restricted Simon Levi, A.B.C. and plaintiff each to an assigned territory. Since the territory assigned to each of the distributors was different, the result was that each distributor had an exclusive area for the sale of Calvert products. As of March 1, 1952, plaintiff and the other two distributors contracted in writing with Calvert. Each of the contracts covered a period of one year. At the termination of the first contract plaintiff entered into a second written contract with Calvert, effective March 1, 1953. This is the contract involved in the present litigation. The contract appointed plaintiff "as a distributor" of Calvert products. The territorial restrictions were essentially the same as before.

In June, 1953, the distributors were notified by Calvert that there would be an "opening up" of the territory—i.e., the distributors would no longer be confined to assigned territories; instead, each would be permitted to sell anywhere in the entire territory. The distributors were happy about the new arrangement and readily agreed to its adoption. In effect the written contracts were modified by an executed oral agreement concerning territorial restrictions.

In October, 1953, Calvert appointed the Don W. Snyder

applicable to the same points of discussion in this appeal in behalf of the plaintiff.

"Plaintiff shall, in consequence, note only the distinctions between the two cases, and, unless otherwise indicated, the Court may assume that the arguments, statements of position and of the facts of this case are materially identical to those set forth in the A.B.C. written submission.

"The relationship of the parties and the contractual instruments asserted in the two cases, the industry background and merchandising and distribution practices, and controlling statutes are identical."

Company as a Calvert distributor for a territory which included Los Angeles and Orange counties. Plaintiff protested this appointment but continued its dealings with Calvert just as before.

On February 2, 1954, Mr. Froelich, a representative of Calvert, called on the president of plaintiff, Mr. Hillinger, and asked him if it was true that plaintiff was planning to "take on" a competing line of distilled spirits. Mr. Hillinger indicated that plaintiff was considering the matter but had made no definite decision. The next day Mr. Froelich told Mr. Hillinger over the telephone that plaintiff's contract would not be renewed. A letter dated February 1, 1954, from Hillinger to Calvert stated: "Please be advised that we are desirous of renewing our contract at the expiration of our agreement." Mr. Froelich replied by letter on February 4, stating: "As I advised you previously . . . we do not intend to renew your contract."

Thereafter, plaintiff commenced distributing the competing line. It continued to order Calvert products in March, 1954, but these orders were not filled. Plaintiff commenced this action on November 1, 1954.

Before discussing the points raised by defendant's appeal, we must consider the question of the renewal of the written contract between plaintiff and Calvert. The contract in this respect is exactly the same as the one before this court in the A.B.C. case, and we there held that the provision in question did not give the distributor an option to renew and that Calvert could refuse to renew the contract if it so desired. (154 Cal.App.2d at 183-186.) Furthermore, the contract states that a distributor wishing to renew must "apply for renewal not less than 30 days before March 1, 1954." Plaintiff's notice of desire to renew the contract was sent less than 30 days before March 1, 1954. It is therefore clear that the contract between plaintiff and Calvert was not renewed in 1954. By its terms this contract expired at the end of February, 1954.

Defendant's appeal concerns the two asserted breaches of contract found by the trial court. The trial court ruled as a matter of law that the appointment of Snyder as an additional Calvert distributor was a breach of contract. The court also ruled as a matter of law that Calvert breached the contract by failing to deliver 162 cases of liquor during February 1954. The court submitted to the jury only the question of damages arising from these two breaches of contract.

▮ Defendant contends that the court erred in ruling as a matter of law that the appointment of the Snyder Company as an additional distributor in the fall of 1953 was a breach of an implied provision in the contract. Defendant's contention is correct. The trial court should have ruled as a matter of law that there was no such implied provision in the contract. The situation in the instant case is substantially the same as in the A.B.C. case, and we there held that as a matter of law there was no such implied provision and hence no breach of contract (154 Cal.App.2d at 186-187). Our opinion in the A.B.C. case fully discusses the law on this subject, so it need not be repeated here. It is there pointed out that the law is clearly against plaintiff's proposition that the contract impliedly prohibited the appointment of Snyder as an additional distributor.

▮ Nor may the trial court's ruling be sustained on the basis of an "executed oral amendment" to the 1953 contract. Plaintiff seeks to fortify its position on this point by certain testimony of Mr. Hecht, who was president of the A.B.C. Distributing Company, to the effect that when the matter of opening up the restricted territory was discussed with him in the latter part of May, 1953, Mr. Taub, who represented Calvert, stated that each of the distributors (California Beverage & Supply Company, Simon Levi and A.B.C.) would service the whole territory and nothing was said about Calvert considering the addition of a new distributor. This evidence does not establish any oral agreement prohibiting an additional distributor. Moreover, it must be borne in mind that this conversation was not had with a representative of plaintiff and is not the conversation upon which plaintiff must rely as the basis for an oral amendment prohibiting the addition of another Calvert distributor. The only conversation upon which plaintiff may rely took place in June between Mr. Hillinger, plaintiff's president, and Mr. Taub, representing defendant. Mr. Hillinger testified that during that conversation "nothing was mentioned" about the addition of any new or different distributors in the territory. There was no other reference to that subject matter. It is thus apparent that there is no substantial basis for finding "an executed oral amendment" between plaintiff and Calvert to the effect that no additional distributor would be appointed for the territory. The only purpose of the conversations mentioned above was to inform the respective distributors that the territorial re-

strictions of each distributor were being removed and that each distributor would be free to service the entire territory. The judgment must therefore be reversed as to the Snyder issue.

Defendant's next contention is that the trial court erred in ruling as a matter of law that Calvert failed to deliver 162 cases of liquor in February, 1954, thus causing a breach of the contract. The evidence sustains this contention. The trial court construed paragraph 12[2] of the contract as allowing plaintiff 30 days after March 1, 1954, to sell Calvert's products, even though the contract terminated on February 28. The court then construed paragraph 5[3] as permitting plaintiff to have at least a 45-day inventory (if Calvert had supplies available to fill plaintiff's orders) on hand at the end of February, 1954. The court concluded that the difference between the amount of this 45-day inventory (1,584 cases) and the amount which plaintiff actually had on hand at the beginning of March (1,422 cases) represented the number of cases which Calvert should have delivered to plaintiff to avoid being in breach of the contract. Although we agree with the court's interpretation of the two paragraphs in question, we cannot accept the court's directing a verdict for plaintiff. It seems perfectly clear that under the contract defendant was under no obligation to deliver to plaintiff during February, 1954, more cases of Calvert products than plaintiff ordered. Plaintiff was entitled to make such orders during the month of February, 1954, as would enable it to maintain a 45-day inventory; but defendant may not be penalized for plaintiff's failure to order the maximum during that month. In deciding that Calvert failed to deliver 162 cases of liquor, the trial court apparently assumed that such cases were ordered and the order was not filled. This was

---

[2]Paragraph 12 reads as follows:

"In the event that this contract is not renewed, Distributor agrees that within 30 days after March 1, 1954, it will return to CALVERT at its invoice price all of the CALVERT merchandise remaining in its inventory."

[3]Paragraph 5 reads as follows:

"CALVERT agrees to supply its products to Distributor to the best of CALVERT's ability, but it is understood and agreed that all or some products may not always be available to fill all orders and CALVERT shall have the right to allocate to Distributor such proportion of the available supplies of its products as CALVERT shall decide in its sole discretion. CALVERT reserves the right not to ship any orders received where such orders would result in an inventory in the hands of Distributor greater than a 45-day inventory, based on the rate of sales of CALVERT products by Distributor for the six months prior to the date of this contract."

a question of fact which should have been submitted to the jury if there was a substantial conflict in the evidence. (*United Air Services, Ltd.* v. *Sampson,* 30 Cal.App.2d 135 [86 P.2d 366].) There was evidence in the record of sufficient substantiality to entitle the jury to conclude that Calvert filled all the orders which plaintiff placed during February, 1954. The exhibits and testimony of plaintiff's own witnesses showed that plaintiff placed written orders during February for 1,440 cases, and that such orders were all filled by Calvert. In prior years plaintiff ordered only 500 or 600 cases in February. Plaintiff's final February order, placed on Friday, February 26, 1954, was accompanied by a letter in which the following statement appeared: ''We are enclosing an order for 320 cases of Calvert which is needed to complete the orders that we have now on hand.'' The only evidence which would support the conclusion that plaintiff placed orders during February which Calvert failed to fill is testimony by Mr. Hillinger. He testified that plaintiff placed certain orders by telephone which Calvert refused to ship. These orders were not confirmed in writing. Nor was there substantial evidence as to the total amount of such orders. But this testimony, if believed by the jury, would tend to establish a breach of contract by Calvert in this regard. It is thus clear that the evidence was conflicting and that the jury should have been permitted to decide how many, if any, cases of Calvert products were ordered by plaintiff and not delivered by Calvert. The judgment must be reversed and the cause remanded for a new trial on this issue. It should be noted that the maximum for which Calvert may be held liable is the net profit on 162 cases of Calvert. The reason for this is that paragraph 5 of the contract gave Calvert the right to refuse to fill orders when it would result in plaintiff's having more than a 45-day inventory on hand; and the difference between that 45-day inventory and the number of cases actually on hand at the beginning of March, 1954, was 162 cases.

 Since there must be a new trial on the question of breach of contract for failure to deliver liquor ordered for February delivery, it is appropriate for us to comment on the issue of good will. The trial court permitted the jury to award plaintiff damages for loss of good will in connection with the 162 cases which Calvert allegedly failed to deliver. This was error. The only question involved was breach of contract;

good will had nothing to do with it. ██ "Good Will" is defined as the expectation of continued public patronage. (Bus. & Prof. Code, § 14100.) It is obvious that plaintiff could have no expectation of continued public patronage in connection with Calvert products since it would no longer be a distributor of Calvert commencing March 1, 1954. ██ The only damage which plaintiff could suffer by reason of Calvert's failure to deliver liquor which it had ordered is the net profit which it would derive from the sale of such products. Therefore, if Calvert is found to have been in breach of contract upon retrial, the measure of plaintiff's damages is the net profit, if any, which plaintiff reasonably could have anticipated.

██ In connection with the question of the February orders we should also consider plaintiff's contention that Calvert's failure to deliver 2,500 cases of liquor, which were ordered on January 25, 1954, was a breach of contract. The 2,500 cases represent two separate orders, one for 1,500 cases and the other for 1,000. The former order called for delivery after March 1, 1954, and the latter order scheduled delivery during the week of March 29, 1954. Defendant contends that Calvert was not required to fill these orders since they called for delivery subsequent to the termination of the contract. The trial court ruled in defendant's favor as a matter of law, and we are convinced that the court's conclusion was correct. While it is clear that plaintiff was entitled to maintain a 45-day inventory during the period the contract was in effect, it is implicit in the agreement that plaintiff was not entitled to maintain such 45-day inventory once the contract terminated. Paragraph 12 of the contract (see footnote 2) merely gave plaintiff a maximum of 30 days after the termination of the contract to dispose of the supply it had on hand at that time. Within such 30 days plaintiff was obligated to return all the unsold Calvert merchandise. To apply plaintiff's interpretation would render paragraphs 11[4] and 12 of the contract meaningless. Plaintiff could cause the contract to continue indefinitely, even beyond its February 28 termination date, simply by placing orders in January and February for delivery in March, April, May and so forth. Plaintiff could thus obtain a substantial number of cases each month even

[4]Paragraph 11 provides:
"This contract shall be effective for a period of 1 year . . . from March 1, 1953. . . ."

though the contract had terminated. The only reasonable interpretation of the contract, therefore, is that Calvert was not required to fill orders for delivery in months subsequent to the termination of the contract, regardless of when such orders were placed.

We turn now to the questions raised by plaintiff's cross-appeal which have not already been discussed. These involve the various allegations of tortious conduct by Calvert. With one exception the material allegations and facts proved in this regard are substantially the same as those in the A.B.C. case. (See 154 Cal.App.2d at 178-183.) We there answered the same contentions which plaintiff makes in the instant case. (Pp. 187-193.) We pointed out that Calvert's refusal to renew the contract because A.B.C. was taking on the line of one of Calvert's principal competitors did not provide a sufficient basis for finding an antitrust law violation. We found no substantial evidence of any conspiracy, restraint of trade or other unfair competition. And we found that plaintiff suffered no injury by reason of the provisions in the contract which it alleges are illegal. Our conclusions in the instant case are the same, and it is unnecessary here to duplicate our discussion in the A.B.C. case of the pertinent authorities.[5] It will suffice to consider the additional recent cases upon which plaintiff now relies. One of these is *Black* v. *Magnolia Liquor Co.*, 355 U.S. 24 [78 S.Ct. 106, 2 L.Ed.2d 5], in which the United States Supreme Court held that a wholesaler of alcoholic beverages who made tie-in sales (i.e., compelling a retailer to buy certain brands which he did not desire in order to obtain other brands which he did desire) violated section 5 of the Alcohol Administration Act, and that the suspension of the wholesaler's license was therefore proper. The Black case has no application to the one at bar. There

---

[5]The recent case of *Milton* v. *Hudson Sales Corp.*, 152 Cal.App.2d 418 [313 P.2d 936], supports our conclusion in connection with plaintiff's allegations of unlawful refusal to deal on the part of Calvert. In that case the appellate court reversed the trial court and ordered judgment for defendants upon a cause of action alleging an unlawful agreement to eliminate the plaintiff as a dealer of Hudson automobiles. The court held (pp. 439-447) that the allegations and proof of defendants' refusal to deal with plaintiff did not establish a cause of action under the Cartwright Act. See also *Packard Motor Co.* v. *Webster Motor Car Co.*, 243 F.2d 418, *cert. denied, Webster Motor Car Co.* v. *Packard Motor Car Co.*, 355 U.S. 822 [78 S.Ct. 29, 2 L.Ed.2d 38]; *Schwing Motor Co.* v. *Hudson Sales Corp.*, 138 F.Supp. 899, *aff'd* 239 F.2d 176, *cert. denied*, 355 U.S. 823 [78 S.Ct. 30, 2 L.Ed.2d 38], both of which are relied upon in the Milton case.

is no evidence of any tie-in sales in the instant case. Moreover, the Black case deals with a license suspension by an administrative agency; the question of the right of a private party to seek damages was not involved. One of the aims of the Alcohol Administration Act is to prohibit practices which are analogous to those prohibited by the antitrust law (*Black* v. *Magnolia Liquor Co., supra*), and we held in the A.B.C. case that a violation of an antitrust statute is not actionable by a private party in the absence of any injury to him. (154 Cal.App.2d at 191.) ██ Since plaintiff has failed to establish the fact that it suffered any injury because of Calvert's alleged violations of the above act or any of the antitrust laws, it may not maintain an action based upon such alleged violations.

Plaintiff also relies upon the recent case of *Flintkote Co.* v. *Lysfjord,* 246 F.2d 368. That case deals with an unlawful conspiracy to restrain trade among contractors in the acoustical tile industry. It is not in point because there is not sufficient evidence in the instant case to establish any unlawful conspiracy to restrain trade. The court in the Flintkote case even recognized that "one engaged in private enterprise may select his own customers, and in the absence of an illegal agreement, may sell or refuse to sell to a customer for good cause, or for no cause whatever." (*Flintkote Co.* v. *Lysfjord, supra,* p. 376.)

Plaintiff also relies upon two California cases decided subsequent to the A.B.C. decision. They are *Garmon* v. *San Diego Bldg. Trades Council,* 49 Cal.2d 595 [320 P.2d 473], and *Biakanja* v. *Irving,* 49 Cal.2d 647 [320 P.2d 16]. Neither of these cases has any relevancy to the issues before us.

There is one particular which makes the instant case significantly different from the A.B.C. case. One Donald Richardson, who was employed by plaintiff at the time of the trial, testified that he was working for Calvert during the latter part of 1953 and the first few months of 1954. His job was to cooperate with the Calvert distributors, check their inventories and aid them in securing orders for Calvert products from retailers. Mr. Richardson would sometimes take an order and telephone it in to one of the distributors. Early in February he was told that California Beverage & Supply Company was no longer to be a distributor and he was instructed to confine his operations to the other distributors. He testified that he thereafter instructed retailers that plain-

tiff was no longer a distributor and he sent their orders to one of the other distributors. He stated that on certain occasions during February, 1954, he diverted from plaintiff to other distributors purchases by retailers who had regularly purchased their Calvert products from plaintiff. This testimony, if believed by the jury, would lend support to a finding that Calvert, through its employee, committed acts constituting unlawful interference with a business relationship during February, 1954. ▮ The unjustifiable inducement of a third person not to enter into or continue a business relationship with another, or the wrongful interference with the formation of a contract, is an actionable tort in California. (*Guillory* v. *Godfrey*, 134 Cal.App.2d 628, 632 [286 P.2d 474]; *Masoni* v. *Board of Trade of San Francisco*, 119 Cal. App.2d 738, 741 [260 P.2d 205].) "Whether an intentional interference by a third party is unjustifiable and actionable depends on a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances, among which the methods and means used and the relation of the parties are important." (*Masoni* v. *Board of Trade of San Francisco, supra,* p. 742.) The aforementioned testimony raised a question of fact—namely, whether or not Calvert was guilty of unlawful interference with plaintiff's business relationships by diverting purchases from plaintiff during February, 1954. ▮ It was error for the trial court to rule as a matter of law that the admitted conduct of Calvert's employee, Richardson, was not wrongful. The jury should have been permitted to determine this question and pass upon the credibility of Richardson. Therefore, there must be a new trial upon this issue. In the event that it is determined upon a retrial that Calvert was guilty of a tort in this connection, it should be noted that plaintiff's recovery should be limited to the damage it suffered during February, 1954. Richardson's conduct after March 1, 1954, cannot be considered wrongful in view of the fact that plaintiff's distributorship expired on February 28. Even though plaintiff still had a quantity of Calvert products on hand, Calvert was at liberty to encourage retailers to purchase their supplies of its products from its then distributors.

The judgment is reversed and the cause remanded for a new trial on the two issues specified herein, and the trial court is directed thereafter to enter a new judgment not incon-

sistent with this opinion. Each party shall bear its own costs on this appeal.

Ashburn, J., and Kincaid, J. pro tem.,* concurred.

A petition for a rehearing was denied April 21, 1958, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied May 21, 1958. Carter, J., was of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.