The UPJOHN COMPANY, Plaintiff,

v.

RIAHOM CORPORATION and J.P. Utsick, Defendants.

Civ. A. 86–203 CMW.

United States District Court, D. Delaware.

Dec. 3, 1986.

Jeffrey B. Bove, of Connolly, Bove, Lodge & Hutz, Wilmington, Del. of counsel: Thomas J. Macpeak, Peter D. Olexy, J. Frank Osha, and Cynthia Clarke Dale, of Sughrue, Mion, Zinn, Macpeak & Seas, Washington, D.C., Robert A. Armitage, and Lawrence T. Welch, of The Upjohn Co., Kalamazoo, Mich., for plaintiff.

David A. Anderson, of Potter, Anderson & Corroon, Wilmington, Del. of counsel: Berj A. Terzian, Brian M. Poissant, and Victor N. Balancia, of Pennie & Edmonds, New York City, for defendants.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This action has its roots in a Complaint filed May 6, 1986 by the Upjohn Company ("Upjohn") against Riahom Corporation ("Riahom") alleging unfair competition and patent infringement of Upjohn's widely publicized hair growth drug minoxidil. This Court granted Upjohn's Motion for a Preliminary Injunction on the unfair competition count on August 6, 1986. The Court's Opinion in *Upjohn Co. v. Riahom Corp.*, 641 F.Supp. 1209 (D.Del.1986), narrates the factual background to the current controversy.

On June 13, 1986, defendant Riahom, and its president J.P. Utsick, filed an Answer and Counterclaim. The Counterclaim asserts a cause of action for tortious interference with business relations. Upjohn allegedly interfered with the business relationship between Riahom and one of its suppliers, Cad-Cam, by hiring a private detective to threaten Cad-Cam with reprisals if the company continued to assist Riahom in selling a drug in violation of the patent laws.

On August 23, 1986, Upjohn moved for summary judgment on Riahom's Counterclaim, pursuant to Fed.R.Civ.P. 56(a).

The Court denies the Motion.

FACTS

This case has previously been described as a "hair raising saga." 641 F.Supp. at 1212. The facts relevant to this motion lend new meaning to that characterization.

In late May, 1986, Anthony Makonnen, a private investigator hired by the Upjohn Corporation, paid a visit to the San Francisco headquarters of Cad-Cam Corporation, a firm that manufactures boxes for Riahom, a distributor of its own hair growth drug.[1] The investigator informed Robert DeNola, President of Cad-Cam, that he might be involved in manufacturing packaging for an illegal, mislabelled product that was not approved by the FDA and that violated Upjohn's patent. The investigator further told DeNola that Upjohn was suing Riahom "with all guns available."[2] According to DeNola, the conversation transpired in the following manner:

He [the private investigator] said, "You've been making boxes for these guys. [Riahom]."

I said, "No, I haven't."

He said, "I went to a trade show and saw the boxes."

I said, "You probably saw artist mock-ups for the shows."

He said, "Bull. We've investigated. We've been tracking these guys."[3]

The investigator said Upjohn was defending a patent and that he (the investigator) was here because he wanted to make certain anyone supplying printing or packaging for Riahom was stopped.

On April 4, 1986, Riahom had entered into a contract with Cad-Cam to produce ten thousand boxes for use in the packaging of Riahom's hair care product, RIVIX-IL. This contract was confirmed in an April 5, 1986 letter written by Riahom's

---

1. DeNola Affidavit, ¶ 7, p. 2. [hereinafter references to the Affidavit will take the form in the text: DA-¶, page 3; e.g., DA-¶ 7, p. 2].

2. Memorandum of June 6, 1986 from Riahom's Treasurer relating to the telephone call of June 2, 1986 from Robert DeNola.

3. DeNola Deposition p. 32.

Treasurer. (DA–¶ 1, p. 1). Pursuant to the agreement, Cad-Cam would produce boxes in accordance with specifications to be provided by Riahom. Additionally, Riahom would pay a one-time charge not to exceed $1,200.00. Enclosed with the Treasurer's April 5th letter, was a check for $6,000.00, representing a fifty percent down payment on the total charge for the boxes. (DA–¶ 3, p. 2). It was agreed that delivery of the boxes would take place at the end of April, 1986. (DA–¶ 3, p. 2).

Mr. DeNola subsequently communicated to Riahom that the April delivery date would have to be postponed until the end of May, 1986. Riahom's Treasurer, in early May, 1986, sought to cancel the agreement with Cad-Cam, orally communicated this to Mr. DeNola, and confirmed it in a May 13, 1986 letter. (DA–¶ 4, p. 2). This letter was followed by telephone discussions between DeNola and Riahom. DeNola argued that Cad-Cam had made substantial preparations to produce the RIVIXIL boxes and intended to retain Riahom's $6,000 down payment. He suggested that the best solution for both parties would be for Cad-Cam to proceed with the box production. (DA–¶ 5, p. 2).

Around this time, however, Mr. DeNola was visited by Upjohn's private investigator. According to DeNola, this visit caused Cad-Cam to cease any further business relationship with Riahom. (DA–¶ 7, p. 2).

DISCUSSION

A. The Summary Judgment Standard

The Court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Any doubt as to the existence of genuine issues of fact will be resolved against the moving party and any reasonable inferences from the facts will be resolved in favor of the party against whom the judgment may be entered. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982); *Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters and Joinders*, 676 F.2d 81, 84 (3d Cir.1982); *Devex v. General Motors Corp.*, 579 F.Supp. 690, 693 n. 3 (D.Del.1984). *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

As a practical matter, "[if] the parties disagree about material facts and if the non-moving party would be entitled to relief if the jury believed its version of the facts, then summary judgment is inappropriate." *Landtect Corp. v. State Mutual Life Assur. Co.*, 605 F.2d 75, 79 (3d Cir. 1979); *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *see e.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); 6 J. Moore, *Federal Practice* ¶ 56.13[3] (2d ed. 1966).

B. Cancellation of the Riahom/Cad-Cam Contract

Defendants' counterclaim purports to state a claim for tortious interference with business relations. In this jurisdiction, this tort is known as an "inducement of breach of contract." Upjohn does not deny that its private investigator visited Cad-Cam. Instead, Upjohn makes two arguments. First, that as a factual matter, by the time Anthony Makonnen visited DeNola, Riahom had already cancelled its contract with Cad-Cam. Second, Upjohn contests that, as a matter of law, an assertion of a bona fide legal claim against Riahom for patent infringement cannot constitute tortious interference with business relations. Both arguments are too thin to prevail.

■ This Court adopts the *Restatement (Second) of Torts* definition of tortious interference with contractual relations:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other

from the failure of the third person to perform the contract. § 766 *quoted in Manufactures Hanover Trust Co. v. Kearney Chemicals, Inc.*, 468 F.Supp. 1107, 1111 (D.Del.1979).

The comments to the *Restatement* further suggest that a contract is not a necessary precondition to maintaining a successful action for tortious interference with business relations. "The liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limits, of protection against improper interference in business relations. The added element of a definite contract may be a basis for greater protection; but some protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking." *Restatement (Second) of Torts* § 766 comment C.

Delaware law recognizes this expansive definition of tortious interference with business relations. In *Unit, Inc. v. Kentucky Fried Chicken Corporation*, 304 A.2d 320, 332 (Del.Super.1973), the Delaware Superior Court recognized that "one who, without privilege to do so, induces or otherwise purposely causes a third person not to ... enter into or continue a business relation with another is liable to the other for the harm caused thereby." *See also Bowl-Mar Company v. Brunswick Corporation*, 297 A.2d 61, 65 (Del.Ch.1972)[4].

This broad definition has its historical roots in early English Law. In *Lumley v. Gye*, 2 El. & Bl. 216, 118 Eng.Rep. 749 (1893), a singer under contract to perform at the plaintiff's theatre was induced by the defendant, who operated a rival theatre, to break her contract with the plaintiff in order to sing for the defendant. The decision in favor of the plaintiff rested largely on the analogy of the rules relating to enticement of another's servants. Subsequent cases extend the rule of *Gye* to contracts other than contracts of service and to interference with advantageous business relations, even when they were not cemented by a contract. *See Restatement, supra,* § 766 comment C. *See also* R. Epstein "The Pirates of Pennzoil," 32 U.Chi.L.Sch. Record 3 (1986).

Upjohn's motion will be defeated if there is a reasonable factual dispute as to either of two separate issues: (1) whether there was a Riahom/Cad-Cam contract or (2) whether Riahom/Cad-Cam had an ongoing business relationship.

Cad-Cam rebuts Upjohn's contention that the Riahom/Cad-Cam contract was cancelled prior to the visit of Upjohn's agent to Mr. DeNola. In a sworn affidavit, DeNola confirms that the contractual relationship between Cad-Cam and Riahom did not terminate with the receipt of Riahom's May 13, 1986 letter. (DA–¶¶ 1–3).

In addition, further discussion took place thereafter directed toward accomplishing the original objective of production of RIVIXIL boxes for Riahom by Cad-Cam. DA–¶ 5, p. 2. These protracted negotiations provide evidence of an ongoing relationship between the corporations.

■ On the material now properly before the Court, relevant issues of fact exist as to the status of the business relationship between Riahom and Cad-Cam at the time of Upjohn's discussions with DeNola. Viewing this evidence in the light most favorable to Riahom, a trier of fact may infer that Upjohn's conduct interfered with the Riahom/Cad-Cam business relationship.

---

**4.** *Bowl-Mar* adopts the *American Jurisprudence* definition of tortious interference with a business relationship which has four requirements: (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy: (2) knowledge of the relationship or expectancy on the part of the interferee; (3) an intention interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. "One is liable for commission of this tort who interferes with the business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another." 45 Am.Jur.2d *Interference* § 50.

## C. Asserting a Bona Fide Claim

Upjohn's second argument in support of summary judgment is more subtle, but it too must fail. This argument relies on the *Restatement (Second) of Torts*, § 773 provision for asserting a bona fide claim:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relations if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.[5]

By relying exclusively on this Section, Upjohn paints its argument with too broad a brush. In this context, the Court must split hairs. Delaware courts have never specifically adopted the *Second Restatement* law on asserting a bona fide claim. Rather, the courts employ the language of the *First Restatement of Torts*, § 773 (1939) which provides: "one is *privileged* purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction." *Unit, Inc. v. Kentucky Fried Chicken Corporation*, 301 A.2d 320, 332 (Del.Super.1973) (emphasis added).

In discussing the *First Restatement*, the *Unit* court took the concept of "privilege" to be either "a question of law or a question of fact." The court denied plaintiff's motion for summary judgment based on a claim of absolute privilege because there was a factual question about the existence of a contract. "In this case, there is certainly a factual question as to the very existence of plaintiff's contract right and it cannot be said on summary judgment that an absolute privilege must prevail." *Id.* at 333. Similarly, in the case at bar, there is a question as to the existence of a contract.

The *Unit* court granted plaintiff's summary judgment motion on defendant's counterclaim for tortious interference with business relations, based on the concept of a qualified privilege. The court ruled that a qualified privilege or justification will only be maintained when "the actor in good faith asserts an honest claim." The court went on to decide that on the specific facts of the case, the plaintiff had asserted an honest claim, in good faith. *Id.* at 333.

The question in the case at bar ultimately resolves itself into a factual question about whether Upjohn can assert a qualified privilege. This approach is supported by the *Restatement Second* language which requires "good faith" by a party in protecting its interests "by appropriate means." *Restatement (Second) Torts*, § 773. Although Upjohn may well have a legally protected interest, it is not clear that it was asserted "in good faith" nor was it clear that the threat to protect the legal interest was by "appropriate means."

■ On the record, there remains a material issue of *fact* as to whether Upjohn asserted its interest "in good faith" or by "appropriate means". If Upjohn had merely wanted to notify Cad-Cam that it intended to press its lawsuit against Riahom, it could have alerted the company by letter or in a meeting with company representatives.

---

**5.** The Comment to the *Restatement* indicates that this defense is a narrow one:

> a. The rule stated in this Section gives to the actor a defense for his legally protected interests. It is of narrow scope and protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means. Under these circumstances his interference is not improper although he knows that his conduct will cause another to break his contract or otherwise refuse to do business with a third person. If any of these elements is lacking, the rule stated in this Section, does not apply but he may have some other justification. The actor's claim may be either against the person induced or against the one harmed and it may be an interest in rem or an interest in personam.

Hiring a private detective and having the detective inform one of Riahom's suppliers that all of Riahom's suppliers are being looked into may well not be "appropriate means."[6]

A further indication that Upjohn's conduct was not appropriate is given in the illustrations to § 773 of the *Second Restatement*—the very section cited by plaintiff. The first illustration indicates that a threat of legal proceedings is not improper when communicated in a meeting between a third party and a contracting party. The same illustration, however, indicates that threats of physical violence addressed to parties to a contract would not be proper. Hiring a private investigator to convey an unclear threat falls between these two factual illustrations. There are indications on the record now before the Court that the private investigator used improper language, and uttered an ambiguous threat.[7] On these facts, viewed most favorably to defendant, summary judgment is not warranted.

Plaintiffs' final argument rests on an opinion reported in another district. In *Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons*, 365 F.Supp. 707 (S.D.N.Y.1973), *aff'd. in pertinent part*, 523 F.2d 1331 (2d Cir.1975), Grotrian had a contract with a third party, Wurlitzer. Steinway advised Wurlitzer in a meeting that Grotrian was infringing on Steinway's trademark. Wurlitzer accordingly cancelled its contract with Grotrian, who asserted a tortious interference claim against Steinway. The court denied the claim because Steinway "was entitled to insist, in good faith, on its legal rights, even if such insistence resulted in the cancellation of the Wurlitzer-Grotrian contract." 365 F.Supp. at 720. But in that case, there was no private detective hired, and the court made a specific factual finding, at trial, that the claim had been brought in good faith. *Id.* at 720, n. 66. Here, the factual question of "good faith" and "appropriate means" must be determined more fully. Upjohn's bald assertion that this case is on point cannot withstand close inspection.

Questions of fact concerning Riahom's business relationship with Cad-Cam and concerning Upjohn's assertion of a bona fide claim remain. Accordingly, plaintiff's motion for summary judgment is denied.

An Order will enter in conformity with this Opinion.

---

**6.** *See* note 2, *supra,* and accompanying text.

**7.** *See* notes 1–3, *supra,* and accompanying text.