# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LIVEBARN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. N24C-11-049 CLS |
| BLACK BEAR SPORTS GROUP, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: May 15, 2025
Decided: July 10, 2025

## MEMORANDUM OPINION

*Upon Consideration of Defendant's Motion to Dismiss,*
**DENIED.**

Renée M. Dudek, Esquire of FAEGRE DRINKER BIDDLE & REATH LLP, *Attorney for Plaintiff*.

Andrew L. Cole, Esquire, Nathaniel J. Klepser, Esquire, and Austin R. Niggebrugge, Esquire of COLE SCHOTZ P.C., *Attorneys for Defendant*.

**SCOTT, J.**

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### A. PARTIES

Plaintiff LiveBarn Inc. ("LiveBarn") is a Canadian corporation engaged in the business of providing subscription-based sports streaming services.[2] Through its online platform, LiveBarn offers live and on-demand broadcasting of sporting events, primarily ice hockey, from venues across the United States and Canada.[3]

Defendant Black Bear Sports Group, Inc. ("Black Bear") is a Delaware corporation that operates various ice hockey venues for amateur, youth, and semi-professional hockey leagues, clubs, and tournaments.[4] Murry Gunty founded Black Bear in 2015, and it is a wholly owned subsidiary of Blackstreet Capital Holdings, LLC.[5]

---

[1] Unless otherwise noted, the facts contained herein are drawn from the Complaint and the documents it incorporates by reference and are assumed to be true for purposes of this Motion to Dismiss.

[2] Complaint ¶¶ 12, 17, D.I. 1 ("Compl.").

[3] *Id.* ¶ 18–19; Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment at 1, D.I. 12 ("Opp'n Br.").

[4] Compl. ¶¶ 13, 31; Defendant's Motion to Dismiss or in the Alternative for Summary Judgment at 3, D.I. 7 ("MTD").

[5] Blackstreet Capital Holdings, LLC serves as Mr. Gunty's private equity fund. Compl. ¶ 30.

## B. BACKGROUND

LiveBarn developed a business model whereby it enters into exclusive streaming contracts with sports venues throughout North America.[6]  Under these arrangements, LiveBarn provides and maintains automated streaming equipment and infrastructure at no cost to the venue.[7]  In exchange, the venue grants LiveBarn exclusive rights to broadcast events occurring at the facility.[8]  LiveBarn contracted with over 1,500 venues across North America.[9]

LiveBarn offers various financial incentives to attract venues, which include revenue sharing, guaranteed yearly payments, and other compensation tailored to each venue's specifications and revenue generation capabilities.[10]  According to the Complaint, LiveBarn derives its pricing and incentive terms from internal, confidential data regarding each venue's historical revenue share and the viewership driven to LiveBarn by events at the location.[11]

---

[6] *Id.* ¶¶ 18–21.

[7] *Id.*

[8] *Id.*

[9] Opp'n Br. at 4.

[10] *Id.* at 4–5; Compl. ¶¶ 23–26.

[11] *Id.*

Each of LiveBarn's contracts contains confidentiality provisions prohibiting disclosure of the agreement's terms.[12]  These provisions are designed to protect LiveBarn's competitively valuable pricing strategy and contractual terms from competitors.[13]

In 2021, Black Bear entered a streaming contract with LiveBarn to broadcast hockey games and other events occurring at Black Bear's venues.[14]  This agreement was based on LiveBarn's standard from contract but included Black Bear's specific financial incentives.[15]

The parties' contractual relationship ended in 2024.  In January of that year, Black Bear provided notice of termination, stating it would not renew its contract for the 2024–2025 hockey season.[16]  Black Bear subsequently launched its own competing steaming service called Black Bear TV.[17]

---

[12] Opp'n Br. at 5; Compl. ¶¶ 27–29.

[13] *Id.*

[14] Compl. ¶ 33; Opp'n Br. at 5; MTD at 5–6.

[15] Compl. ¶ 34; Opp'n Br. at 5–6.

[16] Compl. ¶ 38; Opp'n Br. at 6; MTD at 6.

[17] Compl. ¶ 39.  In April 2024, Mr. Gunty became interim commissioner of the United States Premier Hockey League (USPHL), a semi-professional hockey league with teams in the United States and Canada.  Among the events that Black Bear's venues host are games for the USPHL. *Id.* ¶¶ 41–42.

## C. THE SURVEY AND LETTER

Following Black Bear's entry into the streaming business, it sought to attract venues away from LiveBarn. Black Bear sent surveys to numerous USPHL members who maintained streaming contracts with LiveBarn.[18] These surveys requested detailed information about the recipients' streaming contracts with LiveBarn, including the identity of their streaming provider, contract expiration dates, approximate annual revenue received from the streaming provider, and "any other important information" about their streaming arrangements.[19] The surveys repeatedly referenced LiveBarn by name.[20]

According to LiveBarn, Black Bear's surveys successfully induced certain venues to disclose confidential terms of their LiveBarn contracts, including pricing, contract length, and incentive structures.[21]

Subsequent to the survey distribution, Mr. Gunty sent a letter to more than 100 USPHL members, many of whom had streaming contracts with LiveBarn.[22] As alleged, the letter offered Black Bear's streaming services and included statements

---

[18] Compl. ¶ 43; Opp'n Br. at 7; MTD at 6–7.

[19] Compl. ¶ 43; Opp'n Br. at 7.

[20] *Id.*

[21] LiveBarn contends that Black Bear intentionally induced the venues to disclose confidential information from the contracts. Compl. ¶ 46; Opp'n Br. at 8.

[22] Compl. ¶ 50; Opp'n Br. at 8.

demonstrating knowledge of LiveBarn's contract terms.[23]   Specifically, the letter stated "[m]ost LiveBarn contracts have auto-renewal provisions that kick in 90 days prior to expiration" and contain "exclusivity provisions not allowing other fixed cameras."[24]   The letter further promoted Black Bear's services as offering lower costs and higher revenue compared to "the current [LiveBarn] arrangement. . . ."[25]

### D. ALLEGED CONSEQUENCES

LiveBarn alleges Black Barn's conduct caused multiple venues to terminate their exclusive rights contracts with LiveBarn and entered into agreements with Black Bear.[26]   According to the Complaint, Black Bear used the confidential information obtained through its surveys to replicate LiveBarn's pricing terms in its own offers to venues.[27]

LiveBarn further contends Black Bear attempted to induce LiveBarn's customers to breach their contracts' exclusivity terms by suggesting installing

---

[23] *Id.*

[24] Compl. ¶ 51.

[25] *Id.*

[26] *Id.* ¶ 55; Opp'n Br. at 8–9.

[27] Compl. ¶¶ 57–59.

cameras for Black Bear TV, despite contractual provisions prohibiting automated cameras other than LiveBarn's at the venues.[28]

## E. PROCEDURAL HISTORY

On November 6, 2024, LiveBarn initiated this action by filing the Complaint asserting three claims against Black Bear: (1) tortious interference with contractual relations; (2) unfair competition; and (3) unjust enrichment.[29]

On December 20, 2024, Black Bear filed the instant Motion to Dismiss under Rule 12(b)(6), or alternatively for summary judgment.[30]  Black Bear argues LiveBarn failed to state claims upon which relief can be granted, contending: (1) LiveBarn fails to allege an underlying breach of contract necessary for its tortious interference claim; (2) the alleged confidential information is publicly available; and (3) Black Bear's conduct constitutes legitimate competition rather than wrongful interference.[31]  LiveBarn opposes the motion.[32]  On May 15, 2025, the Court heard oral argument on this matter, which is ripe for decision.

---

[28] *Id.* ¶ 60.

[29] *See id.* at 14–16.

[30] *See generally* MTD.

[31] *See id.*

[32] *See generally* Opp'n Br.

# PARTY CONTENTIONS

## A. LIVEBARN'S POSITION[33]

LiveBarn contends Black Bear engaged in tortious interference with contract by knowingly and intentionally inducing LiveBarn's venue customers to breach their confidentiality obligations. Specifically, LiveBarn argues Black Bear sent surveys to more than 100 venues requesting disclosure of confidential contract terms. Per LiveBarn, these surveys caused venues to breach their contractual confidentiality provisions by disclosing the requested information to Black Bear.

LiveBarn further asserts Black Bear's conduct constituted unfair competition. LiveBarn alleges that Black Bear obtained competitively valuable information through improper means and used this information to undercut LiveBarn's terms and steal its customers. LiveBarn maintains that, rather than developing its own pricing strategy through legitimate business methods, Black Bear exploited confidential information to gain an unfair competitive advantage.

With respect to its unjust enrichment claim, LiveBarn argues Black Bear has been unjustly enriched by obtaining valuable streaming contracts through wrongful conduct. LiveBarn contends Black Bear avoided the time and expense of developing

---

[33] LiveBarn's contentions are drawn from the Complaint and Opposition to Motion to Dismiss.

its own contracting strategy by improperly obtaining and using LiveBarn's confidential information.

LiveBarn emphasizes the terms of its contracts are individually tailored to each venue's circumstances, and the confidentiality provisions are essential to protecting its competitive advantage. LiveBarn argues that even if some municipal contracts are publicly available due to disclosure requirements, this does not alter the nature of confidentiality of the numerous private contracts with different terms that Black Bear sought through its surveys.

## B. BLACK BEAR'S POSITION[34]

Black Bear argues LiveBarn failed to state a claim for tortious interference with contract, because LiveBarn has not alleged any venue actually breached its contract. Black Bear contends the Complaint lacks any specific allegation that a particular venue violated its confidentiality obligations or that any contract was actually breached as a result of Black Bear's conduct.

Regarding the contractual confidentiality terms, Black Bear maintains the information it sought through its surveys is publicly available. Black Bear points to LiveBarn's contracts with municipal venues, which are required by law to be publicly, and argues many of LiveBarn's standard form contract terms are already in

---

[34] Black Bear's contentions are drawn from the Motion to Dismiss.

the public domain. Black Bear asserts it cannot be liable for tortious interference based on the disclosure of information that is already publicly available.

Black bear further argues its conduct constitutes legitimate competition, not wrongful interference. Black Bear characterizes its survey as an attempt to comply with its new broadcasting agreement with the USPHL and to ensure it would not violate existing contracts. Black Bear contends offering potential business partners better terms is capitalism, not unfair competition, and LiveBarn's customers have the right to terminate their contracts and enter into new agreements with Black Bear.

With respect to the unfair competition claim, Black Bear argues sending a survey and offering a better deal are not "unfair" actions but rather legitimate competitive conduct. Black Bear maintains it did not engage in any wrongful behavior and LiveBarn's claim fails to identify any improper actions.

Finally, Black Bear asserts the unjust enrichment claim fails because it is premised on the success of the tortious interference and unfair competition claims, both of which fail for independent reasons. Black Bear contends it has not been unjustly enriched because it did not engage in any prohibited conduct and any information it received was publicly available.

**STANDARD OF REVIEW**

Upon a motion to dismiss under Rule 12(b)(6), the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[35] The Court does not, however, accept "conclusory allegations that lack specific supporting factual allegations."[36] But "it is appropriate . . . to give the pleader the benefit of all reasonable inferences that can be drawn from its pleading."[37]

**DISCUSSION**

**A. THE TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS CLAIM SURVIVES.**

Delaware courts have adopted the tortious interference elements articulated in the Restatement (Second) of Torts.[38] "One who intentionally and improperly

---

[35] *See ET Aggregator, LLC v. PFJE AssetCo Hldgs. LLC*, 2023 WL 8535181, at *6 (Del. Super. Dec. 8, 2023).

[36] *Id.* (quoting *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[37] *TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *2 (Del. Super. Sept. 25, 2015) (quotation omitted).

[38] *New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 140 (Del. Ch. 2023) (citing *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010)).

interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other."[39]  A claim for tortious interference with contractual relations requires a plaintiff establish: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[40]

The parties do not dispute LiveBarn maintained contracts with various venues, nor do they dispute Black Bear had knowledge of these contracts based on its own prior contractual relationship with LiveBarn.  The central disputes concern whether Black Bear's conduct actually caused any breach of contract, and whether such conduct was justified.

### 1. LiveBarn's Complaint States a Reasonable Conceivable Claim That Black Bear Caused Customers to Breach Their Contracts.

Black Bear argues LiveBarn failed to allege any venue breached its contract with LiveBarn.[41]  Not so.  The Complaint specifically states, "Black Bear intentionally and improperly induced the Venues to disclose confidential information from their contracts with LiveBarn" and "Black Bear was successful in inducing

---

[39] *Id.* (quoting Restatement (Second) of Torts § 766 (Am. L. Inst. 1979), Westlaw (database updated Oct. 2022)).

[40] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch.1987)).

[41] MTD at 7–8.

Venues to breach their confidentiality provisions and disclose the terms of their contracts with LiveBarn."[42] While LiveBarn has not identified specific venues by name, this level of specificity is sufficient at the dismissal stage.

Black Bear also contends the information it sought was already publicly available, particularly because some municipal venues are required to disclose their contracts publicly.[43] LiveBarn, however, argues its contracts are individually tailored with unique terms for each venue.[44] The fact that some municipal contracts may be publicly available does not render the non-confidential terms of private contracts or the specific terms of other agreements. Given the scope of publicly available information is a question of fact, it is premature for the Court to make a conclusion at this stage.

### 2. Whether Black Bear's Conduct is Without Justification is a Question of Fact.

Under Delaware law, competition alone does not establish liability for tortious interference with contractual relations.[45] "Competition is not necessarily an

---

[42] Compl. ¶¶ 46, 52.

[43] MTD at 12.

[44] Opp'n Br. at 3.

[45] "Certainly not every interference with a prospective customer relationship is unlawful." *Bowl-Mor Co. v. Brunswick Corp.*, 297 A.2d 61, 67 (Del. Ch. 1972).

improper basis for interference."[46]  When evaluating the existence of justification, the Court looks at:

> "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties."[47]

Balancing these factors is a fact-intensive question not suited for a motion to dismiss.[48]  Black Bear's argument that it was merely engaging in legitimate competition does not address how it obtained competitively valuable information. The Complaint alleges Black Bear knowingly induced breaches of confidentiality provisions to obtain information it then used to compete.  Considering the facts in the light most favorable to the non-moving party, the Court cannot conclude as a matter of law that Black Bear's conduct was justified.  Whether the conduct was proper presents a factual question that is inappropriate to address at this stage.[49]

---

[46] *BeautyCon Media ABC Tr. Through Saccullo Bus. Consulting, LLC v. New Gen. Mkt. Partners, LLC*, 2023 WL 5164148, at *8 (Del. Super. Aug. 11, 2023) (citing Restatement (Second) of Torts § 768 cmt. a).

[47] *New Enter. Assocs. 14, L.P.*, 292 A.3d at 142 (citing *WaveDivision*, 49 A.3d at 1174).

[48] *Elder v. El Di, Inc.*, 1997 WL 364049, at *14 (Del. Super. Apr. 24, 1997) ("[W]hether [defendant's] alleged interference was justified or privileged is an issue of fact that cannot be resolved on a motion under Rule 12(b)(6)"); *see also Hursey Porter & Assocs. v. Bounds*, 1994 WL 762670 (Del. Super. Dec. 2, 1994).

[49] *See* Restatement (Second) of Torts § 767 cmt. b ("[T]his branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege .... Since the determination of whether an interference is improper is under the particular circumstances, it is an evaluation of these factors for the precise facts of the case before the court.").

## B.  THE UNFAIR COMPETITION CLAIM SURVIVES.

LiveBarn's unfair competition claim is closely related to its tortious interference claim.  Given the intertwined nature of these two claims, Delaware courts regularly analyze them together.[50]  To state a claim for unfair competition, a plaintiff must allege "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm."[51]  "The essential distinction between legitimate market participation and 'unfair competition' is 'unfair action' by a defendant that prevents 'the plaintiff from legitimately earning revenue.'"[52]

Black Bear's legitimate competition argument fails to account for the means by which it obtained the information necessary to make those offers.  The same conduct LiveBarn alleges constitutes tortious interference—namely, the inducement of breaches of confidentiality provisions to obtain competitively valuable information—also forms the basis of the unfair competition claim.  As discussed above, whether this conduct was wrongful or unfair presents a factual question reserved for a later stage.

---

[50] *See, e.g.*, *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865 (Del. Ch. Jan. 20, 2009).

[51] *Rypac Packaging Mach. Inc. v. Poges,* 2000 WL 567895, at *8 (Del. Ch. May 1, 2000).

[52] *Axogen Corp. v. Integra LifeSciences Corp.*, 2021 WL 5903306, at *4 (Del. Super. Dec. 13, 2021) (citing *GWO Litig. Tr. v. Sprint Sols., Inc.*, 2018 WL 5309477, at *12 (Del. Super. Oct. 25, 2018)).

## C. THE UNJUST ENRICHMENT CLAIM SURVIVES.

Unjust enrichment occurs when one party unjustly retains a benefit to another's loss or retains money or property against the fundamental principles of justice, equity, and good conscience.[53] To state a claim for unjust enrichment, one must establish: "(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law."[54] Delaware courts have been generally reluctant to dismiss unjust enrichment claims at the pleading stage.[55]

LiveBarn alleges Black Bear was enriched by obtaining streaming contracts using confidentially obtained information, while LiveBarn has been impoverished by losing these same contracts. The enrichment and impoverishment are directly related—arising from the same alleged wrongful conduct.

Black Bear argues its unjust enrichment should fail because the underlying tortious interference and unfair competition claims fails.[56] They also contend any

---

[53] *Great Hill Equity P'rs*, 2014 WL 6703980, at *27 (citing *Schock v. Nash*, 732 A.2d 217, 232 (1999)).

[54] *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 728 (Del. Ch. 2023) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).

[55] *See Tornetta v. Musk*, 250 A.3d 793, 813 (Del. Ch. 2019) (The court declined to dismiss the unjust enrichment claim, even though it essentially duplicated the breach of fiduciary duty claim. *See also Chumash Cap. Invs., LLC v. Grand Mesa P'rs, LLC*, 2024 WL 1554184, at *15 (Del. Super. Apr. 10, 2024) ("Plaintiff's unjust enrichment claim, though linked to its fraud claim, is neither duplicative nor superfluous. [The unjust enrichment claim] of the Complaint seeks relief on a theory that is legally distinct from, albeit related to, the fraud claim.").

[56] MTD at 20.

information received from the customers in response to the survey was publicly available information.[57] Because the facts underlying Count IV remain in dispute, the Court cannot conclude as a matter of law Black Bear wasn't unjustly enriched. Accordingly, Count III, which is predicted on the same conduct as Count I and II, also survives.

## CONCLUSION

As explained above, whether Black Bear's conduct is justified as legitimate right to compete requires further factual inquiries that is better suited for a later stage. Thus, Black Bear's Motion to Dismiss is **DENIED**.


**IT IS SO ORDERED.**


*/s/ Calvin L. Scott*
Judge Calvin L. Scott, Jr.

---

[57] *Id.*